UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-15-F

SOUTHEAST COASTAL          )
DEVELOPMENT FUND, L.L.C.,   )
       Plaintiff,         )
                           )
    v.                      )
                           )          O R D E R
COMMERCIAL REAL ESTATE     )
INC., and TERRY L. SMITH,   )
       Defendants.        )

    This matter is before the court on Defendants' Motion to Dismiss [DE-18]. Also before the court

is the Motion to Seal [DE-23] filed by Plaintiff Southeast Coastal Development Fund, L.L.C., and

Defendants' Second Motion to File Documents Under Seal [DE-30]. All motions have been briefed and

are ripe for ruling.

## I. STATEMENT OF THE CASE

    Plaintiff Southeast Coastal Development Fund, L.L.C. ("SCDF") initiated this action on January

10, 2008, by filing a Complaint [DE-1] in this court. In the 29-page Complaint, SCDF alleges that

Defendants Commercial Real Estate Inc. ("CREF") and Terry L. Smith ("Smith") "conspired[1] to form

and successfully implemented a species of Advance Fee Fraud to rob [SCDF] of a substantial deposit."[2]

Compl. [DE-1] at p. 1. SCDF also alleges that Defendants' actions deprived it of "related business

_____

    [1] Defendant Smith contends he is the President of CREF. Aff. of Terry. L. Smith [DE-20-2]. Of course, it is well-settled that generally a corporation, being a single legal entity, cannot conspire with itself, and an agreement between a corporation and its officers, employees or agents is not a conspiracy. _E.g., Buschi v. Kirven_, 775 F.2d 1240, 1251-53 (4th Cir. 1985).

    [2] SCDF has another action pending before the undersigned in which it accuses other defendants of perpetrating "Advance Fee Fraud." _See Southeast Coastal Development Fund, L.L.C. v. Rebecca R. Cruse, et al._, No. 5:08-CV-45-F, Amended Complaint [DE-42].

opportunities measuring in the millions of dollars." *Id.* SCDF asserts claims for fraud, constructive fraud, violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, and breach of contract. On March 4, 2008, Defendants filed the instant Motion to Dismiss [DE-18], arguing that dismissal is appropriate because (1) the court lacks subject matter jurisdiction over this matter; (2) the court cannot assert personal jurisdiction over Defendants; (3) SCDF has failed to state certain claims, and (4) SCDF has failed to join indispensable parties.

## II. STATEMENT OF THE FACTS

The undisputed facts, as taken from the Complaint and the submissions of the parties, are as follows:

SCDF is a North Carolina limited liability company whose principal business involves the acquisition, development, and sale of real property. Compl. [DE-1] ¶ 14. Defendant CREF is a small Pennsylvania corporation, with its principal place of business in Sewickley, Pennsylvania. Compl. [DE-1] ¶ 2, Decl. of Mark Wenick [DE-26] ¶ 9. CREF's principal shareholder and officer is Defendant Smith, who is also resident of Pennsylvania. Compl. [DE-1] ¶ 3; Decl. of Mark Wenick [DE-26] ¶¶ 9-10.

In the early part of 2007, SCDF contracted to purchase a 972-acre tract of land along the Cape Fear River ("the Property") for $33,500,000.00. *Id.* ¶¶ 15.1, 15.2. The purchase agreement names "Southeast Coastal Development Fund, LLC" as the purchaser. Decl. of Mark Wenick [DE-26] ¶ 6, Ex. 2. The purchase agreement required an escrow deposit of $200,000.00. Compl. [DE-1] ¶ 15.3. Pursuant to the purchase agreement, SCDF agreed that $50,000.00 of the escrow deposit would be transferred to the seller on April 27, 2007, and, in the event that SCDF did not cancel is obligations under the agreement, the remaining $150,000.00 would be transferred to the seller on July 31, 2007.

*Id.* at ¶¶ 15.4-15.5. Closing was to occur no later than August 30, 2007. *Id.* at ¶ 15.6. SCDF contends that it intended to acquire and develop the property into a high-end golfing and marine-based residential community, and that it required capitalization or debt financing in the aggregate amount of $50,000,000.00. *Id.* at ¶¶ 16-17.

SCDF admits that it initiated contact with Defendants in or around May 2007, "to determine whether [D]efendants were able and willing to assist plaintiff in the procurement of sufficient funds to acquire and preliminarily develop the property." *Id.* at ¶ 18. SCDF contends that from May through July 2007, its managing members communicated with Smith on many occasions about the prospect of SCDF engaging CREF's services to procure the substantial financing needed for the project. *Id.* at ¶ 19, Decl. of Mark Wenick [DE-26] ¶¶ 9-24. SCDF alleges that during these communications, Defendants made false representations regarding their abilities, track record, and efforts to be taken on behalf of SCDF. Compl. [DE-1] ¶¶ 20-24.

In late June 2007, Smith sent a proposed "Confidentiality and Business Agreement" ("CBA") to SCDF. The draft agreement included what SCDF characterizes as "several dozen typographical errors," including referring to SCDF as " 'Southeast Costal[sic] Development Funds, Fund 11', LLC a.ka. Balmoral."[3] Decl. of Mark Wenick [DE-26], Ex. 4. The June Confidentiality and Business Agreement stated it was "between the following parties":

> Mark J. Wenick, (MW), Individual and CEO, Steve Burch, (SB), Individual and Managing Member, and Anthony Jay Mouser, (AJM), Individual and Managing Member of the special purpose created entity known as "Southeast Costal[sic] Development Funds, Fund 11", a.k.a. Balmoral. (Entity), whose address is c/o Don Hunt, Esquire Akins Hunt Attorneys at Law 134 North Main Street, Suite 204, Fuquay-Varina, NC 27526, U.S.A.

---

[3] SCDF refers to this as an "incorrect spelling" of its name. Response [DE-25] at p. 4.

AND

Terry L. Smith, (TLS) President of Commercial Real Estate Financing, Inc., (CREF), whose present address is 325 Sixth Avenue, Pittsburgh, PA 15222, U.S.A., and future address of Car Barn Shops, 2ⁿᵈ Floor, P.O. Box 81 Sewickley, PA 15143, U.S.A.

*Id.* The document provided: "The above referenced parties have entered into this agreement to obtain financing monies, including debt and/or equity for the transaction presently known as 'Southeast Costal [sic] Developments Funds, Fund 11, LLC. a.k.a. Balmoral['] (Entity)." *Id.* The document also explicitly provided:

This Agreement has an expiration date of June 21, 2007 to be accepted and TIME IS OF THE ESSANCE [sic]. Should this Agreement not be accepted by close of business on June 21, 2007, all exclusive rights to the funding and service providers remains with (TLS) & (CREF[)] for life, and the Agreement will need to be negotiated to the terms of (TLS) & (CREF).

*Id.*

Mark Wenick, the managing member and chief executive officer of SCDF, contends that despite being "alarmed" by the number of "typographical errors," he spoke to Smith over the next several days about the proposed CBA. Decl. of Mark Wenick [DE-26] ¶ 14. Wenick maintains that he discussed with Smith "the misspelling of Southeast Coastal Development Fund, LLC's name and that none of the managing members of the company intended to be personal parties to his proposed transaction." *Id.* Wenick contends that Smith "indicated that he understood [Wenick's] concerns . . . [but] his attorneys would not allow him to modify the text of his proposal." *Id.* There is no indication that the June 18, 2007, CBA was accepted by SCDF or any other entity.

On July 9, 2007, Smith faxed a new version of the CBA to SCDF's offices in North Carolina. *Id.* at ¶ 15, Ex. 5. The July 9, 2007, CBA proposal contained the same description of the "parties"

present in the June 18, 2007 proposal. With regard to the timing of acceptance, the July 9, 2007,

proposal provided:

> This Agreement has an expiration date of July 10, 2007, to be accepted and TIME IS OF
> THE ESSANCE [sic]. Should this Agreement not be accepted by close of business on
> July[]10, 2007, all exclusive rights to the fund and service providers remains with (TLS)
> & (CRE[)] for life, and the Agreement will need to be negotiated to the terms of (TLS)
> & (CREF).

*Id.* The proposal also provided:

> Should any party of this transaction cause a breach of this contract, legal action will
> be taken against the breaching party in the state of the breached party, and any and all
> legal expenses are to be paid by the breaching party.
>
> By placing your signature on the space provided, any and/or all parties have read,
> understand and agree to the terms and conditions of this agreement. This Agreement
> is binding and non-negotiable.

> _____
> Mark J. Wenick, Individual and CEO of (Entity).

> _____
> Steve Burch, Individual and Managing Member of the (Entity).

> _____
> Anthony Jay Mouser, Individual and Managing Member of the (Entity)

> _____
> Terry L. Smith, President of (CREF).

*Id.* Smith, as President of CREF, already had signed the document when it was received by SCDF.

On July 10, 2007, Wenick sent an email to Smith that included a proposed addendum to the

proposed agreement. Decl. of Mark Wenick ¶ 16, Ex. 6. Wenick avers he sent the addendum because

the proposed agreement "continued to contain typographical errors," and because he thought "the name

Southeast Coastal Development Fund, LLC and the limited role its managing members were to have in

connection with the agreement" needed clarification. *Id.* In the email, Wenick wrote:

> Attached is the recommended addendum to the Confidentiality and Business
> Agreement. As you will see, the addendum provides further clarification on the
> issues that we discussed last Friday:
>     1. Our personal liability,

2. The funding sources you bring to the table and the funding sources with which we are already working,
3. The fee will be paying your firm for funding and "break up"; and,
4. The marketing of the project[.]

Upon your review, discussion regarding any issues and your eventual approval, we will put this addendum on our letterhead, execute the same and send to you for signature.

Decl. of Mark Wenick, Ex. 6. The addendum specified that the "two business entities entering the Agreement are (i) Commercial Real Estate Financing, Inc. (CREF) and (ii) Southeast Coastal Development Fund, L.L.C., a North Carolina Limited Liability Company." *Id.* The addendum also stated: "CREF will disclose ___ financing sources within two (2) business days after the Agreement and this Addendum are executed by the parties." *Id.* Smith replied to Wenick's email, adamantly rejecting, in no uncertain terms, the addendum.[4]

No member of SCDF, or any other party, signed the proposed CBA by the close of business on July 10, 2007. Nevertheless, Wenick indicates that Smith continued to communicate with Wenick via telephone. Despite the red flags being waved, including the numerous "typographical errors" and Smith's adamant opposition to the addendum, Wenick contends "the managers of Southeast Coastal Development Fund, LLC agreed to engage Mr. Smith and his company provided he would accept a few what I considered to be basic and straightforward modifications to his proposed agreement." Decl. of Mark Wenick ¶ 17.[5]

---

[4] Specifically, Smith stated:
Your egos far exceed your talents!!! Do you really think that I am giving up my sources at any time for anybody?? You are out of your mind and so is your attorney!!
Decl. of Mark Wenick, Ex. 6.

[5] SCDF apparently felt the need for assistance in acquiring financing despite the fact that it already had contacted, in some manner, twenty-three sources of financing. *See* Decl. of Mark Wenick [DE-26], Ex. 8 ("Terry, Following are the contacts we have made that have resulted in

Consequently, on July 12, 2007, Wenick and Anthony Mouser, another managing member of SCDF, signed the CBA, and sent it and a check payable to CREF in the amount of $35,000.00 to Smith via Federal Express Overnight courier. *Id.* at ¶ 18. Along with the signed CBA and check, Wenick also included a letter to Smith "outlining [SCDF's] expectations and modifications to the proposed agreement," along with "literally several hundred pages of documents relating to the Balmoral project." *Id.* Despite SCDF's assertion that the letter, together with the signed CBA, constituted a counteroffer with differing terms from CREF's original proposal, the letter does not state as much. Instead, the letter states, in part, the following:

Please find enclosed are[sic] the following items:

1. Executed Business and Confidentiality Agreement;
2. Check payable to CREF, Inc in the amount of $35,000.00; and
3. Personal financial information from Burch, Mouser and Wenick.

The company is looking forward to working with you to complete the funding of our Balmoral Project through debt and equity financing provided to Southeast Coastal Development Fund, LLC. I want to confirm with you that we are not interested in pursuing any financing arrangements that require personal signatures which result in our personal financial liability.

Our intention when signing the enclosed Agreement personally was to satisfy your request and acknowledge that we are providing financial information to you. It is our understanding that we are to have no other personal liability under the agreement or for any other claims related to the agreement.

Decl. of Mark Wenick [DE-26], Ex. 7.

On July 13, 2007, Smith sent an email to Wenick informing him that his "package arrived in good order today." Decl. of Mark Wenick [DE-26] ¶ 19, Ex. 8. Smith also negotiated SCDF's check. *Id.*

---

more than a phone call. In most cases, we have made in-person presentations and have had additional conversation.").

Throughout the months of July and August 2007, the parties maintained communications with each other. Of particular importance to SCDF was the fact that most of the escrow deposit it had paid pursuant to the purchase agreement for the Balmoral project was conditionally refundable provided SCDF cancelled the purchase agreement on or before July 31, 2007. Decl. of Mark Wenick [DE-26] ¶ 21. Wenick contends that on or about July 31, 2007, he personally spoke with Smith about whether SCDF should cancel the purchase agreement. He represents that Smith "unequivocally advised me that [SCDF] should not cancel the contract and implicit in his representation was the acknowledgment that Mr. Smith had arranged financing from one of his 'sources.' " *Id.* at ¶ 22. Wenick contends that on reliance of this representation, SCDF did not cancel the purchase agreement, and the escrow deposit became non-refundable. *Id.* Wenick contends that shortly thereafter, Defendants ceased communicating with SCDF altogether, and did not arrange financing for the project. *Id.* at ¶¶ 23-24.

### III. STANDARD OF REVIEW

With regard to Defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the Fourth Circuit has summarized the applicable legal standards:

> When a Rule 12(b)(1 ) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Id.; Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir.1987). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Trentacosta, supra*, 813 F.2d at 1559 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)). The moving party should prevail only if the material facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Trentacosta, supra*, 813 F.2d at 1558.

*Richmond, Fredericksburg, & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

When a court considers a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in a complaint will be construed in the nonmoving party's favor and treated as true. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). The court is " 'not so bound with respect to [the complaint's] legal conclusions.' " *Self v. Norfolk Southern* Corp., No. 07-1242, 2008 WL 410284, slip. op. at 1 (4th Cir. Feb. 13, 2008) (per curiam)(quoting *Dist. 28, United Mine Workers, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1979)). The complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). If a claim has been adequately stated in the complaint, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1969 (2007).

Dismissal, however, is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996). *See generally*, 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004) ("A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading," rendering dismissal appropriate). Furthermore, in considering a motion to dismiss, a court may take judicial notice of matters of public record, and consider documents attached to the complaint and the motion to dismiss, so long as the documents are integral to the complaint and authentic. *Secretary of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

A court also may dismiss an action pursuant to Rule 12(b)(7) for failure to join a party in accordance with Rule 19. A court faced with a motion under Rule 12(b)(7) first determines if the absent

party should be joined as a required party under Rule 19(a)(1). *See, e.g. RPR & Assocs. v. Obrien/Atkins Assocs., P.A.*, 921 F. Supp. 1457, 1463 (M.D.N.C. 1995). Pursuant to Rule 19, a party is "required" if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of an action and is so situated that the disposition of the act in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to risk of incurring multiple or otherwise inconsistent obligations by reason of the claimed interest. FED. R. CIV. P. 19(a)(1). If a court, after viewing the allegations in the pleadings, determines that a person is required under Rule 19(a), and if joinder of that person is impossible due to jurisdictional or equitable limitations, the court shall determine whether in equity or good conscience the action should proceed among the parties before it, or should be dismissed under Rule 12(b)(7). *See* FED. R. CIV. P. 19(b).

Finally, a federal court may dismiss an action pursuant to Rule 12(b)(2) if the court lacks personal jurisdiction over non-resident defendants. When the court decides a motion to dismiss for lack of jurisdiction solely on the basis of the motions, legal memoranda, and affidavits submitted to the court, the plaintiff bears the burden of making a *prima facie* showing of personal jurisdiction. *See Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). When considering a jurisdictional challenge, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.*

## IV. ANALYSIS

### A. Introduction to Analysis

Underlying all of the parties' briefings is their fundamental disagreement over when a contract was formed between the parties, if any, and the terms thereof. The parties' dispute implicate the most fundamental maxims of contract law, and also affects this court's choice of law analysis.

A federal court sitting in diversity must apply the law of the highest court of the state in which the suit was brought. *See Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). Thus, this court must apply the choice-of-law rules of the North Carolina Supreme Court. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For tort actions, North Carolina adheres to the *lex loci delicit* rule–it applies the law of the state wherein the injury occurred. *Boudreau v. Baughman*, 368 S.E.2d 849, 853-54 (N.C. 1988). For claims sounding in contract, however, North Carolina adheres to the rule of *lex loci contractus*, which mandates the application of "the substantive law of the state where the last act to make a binding contract occurred." *Fortune Ins. Co. v. Owens*, 526 S.E.2d 463, 465-66 (N.C. 2000).

But, in this case, the parties disagree as to when and how the contract at issue–the CBA–was formed. Defendants contend that the CBA was fully formed and executed once Wenick and Mouser signed the proposed CBA in North Carolina. SCDF, however, contends the proposal for the CBA expired, according to its terms, on July 10, 2007–before it was signed by any members of SCDF. Thus, according to SCDF, the signing and mailing of the CBA, along with the check and letter, constitutes an offer, which was accepted by Defendants when Defendants cashed the check in Pennsylvania.

Under either North Carolina or Pennsylvania law, an "offer may specify in it the time within which acceptance must occur; if it does, the power of acceptance is limited accordingly." 1 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 2.14 (Rev. Ed. 2008). *See also Normile v. Miller*, 326 S.E.2d 11, 14-15 (N.C. 1985)(quoting Arthur Linton Corbin, *Offer and Acceptance, and Some of the*

11

*Resulting Legal Relations*, 26 YALE L.J. 169, 182 (1917)) (explaining that "the offeree's . . . power of acceptance was controlled by the duration of time for acceptance of the offer" and if the offeror " 'names a specific period for [the] existence [of the offer], the offeree can accept only during this period' ").

Thus, SCDF appears to be correct in its assertion that the offer from CREF expired on July 10, 2007.

However, SCDF's own submissions indicate that Wenick continued to discuss the CBA after the July 10, 2007, deadline, which indicates that CREF may have extended the deadline for acceptance. The substance of those conversations are not before the court at this juncture, and consequently the court cannot conclude when, if ever, a valid contract was formed between the parties.[6] For this reason, when contractual analysis is required in this order, the court will consult both North Carolina and Pennsylvania law.

## B. 12(b)(1) Motion-Standing

The court first address the threshold issue of standing. *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001)("Standing is a threshold jurisdictional question."). Defendants contend that the action must be dismissed because SCDF is not a party to the CBA, and therefore, does not have standing to bring any of the claims in the Complaint. Based on the allegations in the Complaint, combined with the evidence submitted by the parties, the court cannot agree.

It is well-settled that "[a] mistake in setting out the name of a corporation in an instrument is not fatal where the identity of the corporation is apparent." WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 3014 (1997). *See also Troy & North Carolina Gold Mining Co. v. Snow Lumber Co.*, 170 N.C. 273, 273, 87 S.E. 40, 42 (1915)("A misnomer [in a

---

[6] Of course, even if the time for acceptance was extended, issues remain as to whether SCDF's letter still constituted a counteroffer and whether there was a meeting of the minds between the parties.

deed] does not vitiate, provided the identity of the corporation with that intended to be named by the parties is apparent."); *In re Hendel v. Berks & Dauphin Turnpike Road*, 16 Serg & Rawle 92 (Pa. 1827). In this case, the evidence submitted to the court would allow a jury to find that SCDF, as opposed to "'Southeast Costal[sic] Development Funds, Fund 11', a.k.a. Balmoral," was the party with which CREF contracted. Defendants cannot now credibly claim that CREF contracted with a non-existent entity[7], especially after Wenick repeatedly referred to the entity in question as "Southeast Coastal Development Fund" and Smith, on behalf of CREF, negotiated the check drawn on SCDF's account. *See* Decl. of Mark Wenick [DE-26], Ex. 6 (proposed addendum identifying the entity as "Southeast Coastal Development Fund, L.L.C."), Ex. 7 (letter stating "The company is looking forward to working with you to complete the funding of our Balmoral Project through debt and equity financing provided to Southeast Coastal Development Fund, LLC" and signed " Southeast Coastal Development Fund, LLC" as well as a check written on an account listed as "Southeast Coastal Development Fund LLC"). Consequently, Defendants' motion to dismiss pursuant to Rule 12(b)(1) for lack of standing is DENIED.

## B. 12(b)(2) Motion–Personal Jurisdiction

Defendants argue that they lack sufficient minimum contacts with the State of North Carolina, such that this action must be dismissed because this court cannot exercise personal jurisdiction over them.

### 1. Personal Jurisdiction

---

[7] Decl. of Mark Wenick [DE-26] ¶ 26 ("I am personally unaware of any entity known as 'Southeast Coastal Development Funds, Fund 11' and neither I nor any other person in my presence ever[] told Mr. Smith that such an entity exists. I have never been the manager, member, officer or agent of a company known as 'Southeast Coastal Development Funds, Fund 11,' and as far as I know, it is a non-existent entity.").

Analysis of personal jurisdiction consists of a two-part inquiry. First, the court must determine whether North Carolina's long-arm statute authorizes the exercise of personal jurisdiction over the defendants. *See Christian Scientist Bd. of Directors of First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). Second, if the long-arm statute does authorize jurisdiction, then the court must examine whether the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *See id.* North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, was enacted "to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process." *Dillon v. Numismatic Funding Corp.*, 231 S.E.2d 629, 630 (N.C. 1977). Because North Carolina long-arm jurisdiction has been interpreted to be coextensive with the limits of due process, the normal two-step personal jurisdiction test has been collapsed into a single inquiry of whether the exercise of jurisdiction comports with due process. *See Nolan*, 259 F.3d at 215.

"The Due Process Clause of the Fourteenth Amendment operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 404, 413-14 (1984). " '[T]he constitutional touchstone' " of the due process inquiry is " 'whether the defendant purposefully established "minimum contacts" in the forum State.' " *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 108-09 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))). These minimum contacts must arise out of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475. Furthermore, the "defendant's conduct and connection with the forum State" must be "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). If the

14

defendant's "contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state," then jurisdiction is proper. *Burger King*, 471 U.S. at 475 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Once the court decides that a defendant purposefully established minimum contacts within the forum state, the court must then consider whether its assertion of personal jurisdiction would violate " 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

"The requisite contacts may be established by way of general or specific jurisdiction." *Hardee's Food Sys., Inc. v. Beardmore*, 169 F.R.D. 311, 314 (E.D.N.C. 1996). General jurisdiction enables a foreign forum to exercise jurisdiction over a defendant due to the defendant's "continuous and systematic" contacts with the forum. *Helicopteros*, 466 U.S. at 414-16. Specific jurisdiction exists when the suit itself arises out of a defendant's contact with the forum state. *See id.* at 414 n.8. In this case, SCDF does not contend that general jurisdiction exists.

## 2. Specific Jurisdiction

In determining whether specific jurisdiction is appropriate, the court must examine three factors: First, to what extent did Defendants "purposefully avail" itself of the privileges of conducting activities in North Carolina and thus invoke the benefits and protections of its laws; second, do SCDF's claims arise out of those North Carolina-related activities; and, third, is the exercise of jurisdiction reasonable. *Nolan*, 259 F.3d at 215. In conducting this inquiry, the court should focus on the "quality and nature" of Defendants' contacts, and not " 'merely count the contacts and quantitatively compare this case to other preceding cases.' " *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 397 (4th Cir. 2003)(quoting *Nichols v. G.D. Searle & Co.*, 783 F. Supp. 233, 238 (D.MD. 1992), *aff'd*, 991 F.2d 1195 (4th Cir. 1993)).

"The requirement of purposeful availment provides fair warning to potential defendants, allowing them to structure their conduct 'with some minimum assurance as to where that conduct will and will not render them liable to suit.' " *B.E.E. Int'l, Ltd. v. Hawes*, 267 F.Supp.2d 477 (M.D.N.C. 2003)(quoting *World-Wide Volkswagen*, 444 U.S. 286, 297(1980)). The Supreme Court has noted that if a defendant himself has created a substantial connection with the forum state, or has created continuing obligations between himself and the residents of the forum, he has met this purposeful availment requirement. *Burger King*, 471 U.S. at 475. The court, of course, is aware that merely entering into a contract with a forum state resident is, alone, insufficient to automatically establish the purposeful availment of that forum's jurisdiction. *See Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1127-28 (4th Cir. 1986)(citing *Burger King*, 105 S.Ct. at 2185). Instead, the court must consider the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [to determine] whether the defendant purposefully established minimum contacts in the forum." *Burger King*, 471 U.S. at 479.

Defendants argue that this court cannot assert specific jurisdiction over them where SCDF initiated contact with CREF, SCDF traveled to Pennsylvania to meet with Smith, and the parties negotiated the terms of the contract over telephone and email. Defendants never entered the state of North Carolina. Defendants also note that neither party contemplated that a significant amount of work under the contract would be performed in North Carolina, and that the mere fact that Defendants entered into a contract with a North Carolina resident is not enough to establish minimum contacts. Were these the extent of the pertinent facts, the court would undoubtedly agree with Defendants' assertion that the court cannot exercise specific jurisdiction. *Cf. Le Bleu Corp. v. Standard Capital Group, Inc.*, 11 Fed. Appx. 377 (4th Cir. 2001)(unpublished)(finding that defendant, a California corporation, had only a

"negligible connection with North Carolina" where defendant and plaintiff, a North Carolina corporation, had exchanged some mail and telephone calls, that two visits were made to North Carolina by defendant's employees, that a payment was mailed from North Carolina, and that the contract was signed in North Carolina).

These are not, however, the extent of the facts. The parties' contract[8] also included a clause which provides: "Should any party of this transaction cause a breach of this contract, legal action will be taken against the breaching party in the state of the breached party, and any and all legal expenses are to be paid by the breaching party." Decl. of Mark Wenick [DE-26], Ex. 5. SCDF contends this is a forum selection clause, and that based on this clause, this court may exercise personal jurisdiction over both Smith and CREF. *See, e.g., Preferred Capital, Inc. v. Associates in Urology*, 453 F.3d 718, 721 (6th Cir. 2006)(explaining that contracting parties may submit to the jurisdiction of a particular court through the use of a forum selection clause, and thereby waive the requirement that the court have personal jurisdiction over the parties).

### 3. Forum Selection Clause

Defendants argue that the language in the CBA cannot be read as a forum selection clause, and thereby cannot be read to waive any objection to personal jurisdiction, because it "is so ambiguous that it could be read broadly to permit almost limitless personal jurisdiction anywhere in the United States where any party to the CBA is found at any time." Reply [DE-31] at p. 4. The clause, however, is not ambiguous, and the language indicates that the parties did agree to be sued anywhere in the United

---

[8] Although the parties dispute the exact terms and meaning of the contract, under either party's argument the clause is included.

States where any party to the CBA is found.[9] Moreover, even if the provision were ambiguous, the Defendants' interpretation of the clause–"the breached party may file suit in the state where it is then found, and presumably, the defendant can challenge the court's jurisdiction"–renders the clause meaningless and superfluous. There is no logical need for a provision that merely states that a party may file suit where ever it is located, and the opposing party may then challenge the suit on personal jurisdiction grounds; that is the status between all parties to a contract in the absence of a forum selection provision. Thus, even if the court did consider the clause to be ambiguous, it could not interpret the clause in the same manner as Defendants. *See, e.g., Johnston County v. R.N. Rouse & Co., Inc.*, 331 N.C. 88, 414 S.E.2d 30(1992)(observing that courts must construe contracts "in manner that gives effects to all its terms and provision"); *Atlantic Richfield Co. v. Razumic*, 480 A.2d 736, 740 (Pa. 1978)(explaining that contracts must be construed in a way that gives meaning and effect to all their terms). Furthermore, CREF drafted the provision at issue in this case; consequently, if it was ambiguous, it would be construed against CREF. *Novacare Orthotics & Prosthetics East, Inc. v. Speelman*, 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (2000)("[W]hen an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter–the party responsible for choosing the questionable language."); *Commonwealth of Pennsylvania, Dept. of Transportation v. Semanderes*, 531 A.2d 815,818 (Pa. Commw. Ct. 1987)("When a contract is ambiguous, it is undisputed that the rule of *contra proforentem* requires the language to be construed against the drafter . . . and in favor of the other party if the latter's interpretation is reasonable.").

### a. Tort claims

---

[9] Defendants correctly observe, however, that the language does not indicate that the parties consented to the application of any particular state's laws.

Nevertheless, Defendants contend that the forum selection clause at issue does not confer personal jurisdiction over the Defendants for causes of action arising in tort. It appears that neither the North Carolina appellate courts, nor the Fourth Circuit, have addressed the precise issue of whether the "scope" of a forum selection clause includes torts claims. The courts have that addressed the issue, however, employ a variety of tests or maxims to determine whether tort claims should be subject to the forum selection clause. *See, e.g., Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993)(providing that "contract related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties"); *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir. 1988)("Whether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract."); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3rd Cir. 1983)(explaining that where tort claims "ultimately depend on the existence of a contractual relationship" between the parties, such claims are governed by a forum selection clause). Under any of these maxims, SCDF's tort claims are governed by the forum selection clause.

### b. Application of forum selection clause to Smith

Regardless, Smith contends that he personally cannot be bound by the forum selection clause because he is not a party to the contract. In opposition, SCDF cites different provisions which it contends "bestow benefits and impose obligations upon *both* [Smith] and 'CREF.' " Mem. in Opp. to Mot. for Summ. J. [DE-25] at p. 20. SCDF contends that such language indicates that Smith individually is a party to the contract. Even if the contract could be read as imposing obligations upon Smith individually, however, the fact remains that there is no indication in the record that Smith *individually and personally agreed* to the obligations therein. The materials submitted by SCDF show

that Smith signed the CBA in his capacity as President of CREF. *See* Decl. of Mark Wenick [DE-26], Ex. 7(agreement signed by "Terry L. Smith, President of (CREF)"). This is in contrast to the members of SCDF, whose signatures are identified as "Individual and Managing Member" or "Individual and CEO" of SCDF. *Id.* Moreover, the check submitted by SCDF was made out to CREF, not Terry Smith. Finally, the letter transmitting the signed CBA was addressed to "Terry L. Smith, President." *Id.* There is, in short, no evidence showing that Smith, as an individual, agreed to any of the terms in the CBA. Without any such evidence, the court cannot find, for purposes of establishing personal jurisdiction, that Smith agreed to be a party individually to the CBA. Consequently, he cannot be bound by the forum selection provision in the CBA. Moreover, SCDF has not shown that Smith, individually, has sufficient contacts with North Carolina in order to support specific jurisdiction. Consequently, the Rule 12(b)(2) motion to dismiss for lack of jurisdiction is ALLOWED as to Defendant Smith.

## C. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

Relying on a 1986 decision from this court, *American Rockwool, Inc. v. Owens-Corning Fiberglass Corp.*, 640 F. Supp. 1411 (E.D.N.C. 1986), CREF argues that SCDF's claim for treble damages under North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA) must be dismissed. In *Rockwool*, the alleged unfair or deceptive trade practice at issue was product disparagement by an Ohio company about a product produced by a North Carolina competitor. *Id.* at 1436. The Ohio company conducted a multi-state disparagement campaign, and made statements about plaintiff's products "to citizens of numerous other states other than North Carolina, in competition with [] manufacturers from a variety of states other than North Carolina." *Id.* The undersigned determined that application of UDTPA's treble damages provision to extra-territorial conduct in that case did "not comport with due process notice requirements." *Id.* **The undersigned also concluded that the**

application of the treble damages provision to extra-territorial conduct in that case was "both burdensome and discriminatory without anything to be weighed in the balance to sustain the law" and as such, the application violated the Commerce Clause of the United States Constitution. *Id.* at 1437.

Defendants cite to *American Rockwool* in support of their argument that the treble damages provision of UDTPA cannot be applied to extra-territorial conduct. SCDF, for its part, responds only summarily to CREF's arguments regarding *American Rockwool*, and has not addressed this court's commerce clause analysis in *American Rockwool* and why or how it should be distinguished. Although over twenty years has passed since this court first addressed the issue, the undersigned is inclined to agree with his original analysis. Accordingly, SCDF's claim for treble damages is DISMISSED.

## C. Rule 12(b)(7) Motion–Failure to Join Indispensable Parties

CREF argues that Wenick, Burch, and Mouser are parties to the CBA, and as such, they are necessary parties to this action. The court reiterates that when, and indeed *whether*, a valid contract was formed between CREF and SCDF is a matter that is in dispute at this juncture. Under CREF's version of the facts, the contract was formed when Wenick and Mouser signed the CBA proposal in their *individual* capacities. Again, SCDF maintains that Wenick and Mouser are not individual parties to the contract. Under either parties' vision, Burch could not be a party to the CBA–he never signed it. The court concludes, however, that Wenick and Mouser are necessary parties to this action under Rule 19(a) of the Federal Rules of Civil Procedure. FED. R. CIV. P. 19(a)(1)(B)("A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical mater impair or impede the

person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.").

The court agrees, however, with SCDF that the proper remedy in this case is not to dismiss the action, but rather to allow SCDF to file an Amended Complaint naming both Wenick and Mouser as plaintiffs. Accordingly, SCDF is DIRECTED to, within fourteen (14) days of the filing date of this order, file an Amended Complaint naming both Wenick and Mouser as plaintiffs.

## D. Motions to Seal

Both SCDF and Defendants have filed motions to seal [DE-23 & DE-30] memoranda and exhibits with regard to the motions to dismiss. Although SCDF's motion is denominated a "Notice of Filing and Motion to File Documents Under Seal," SCDF actually is asking the court to reconsider its March 11, 2008 Order [DE-19] which allowed Defendants to file their memorandum in support of their motion to dismiss and accompanying exhibits under seal.

The court's March 11, 2008 Order [DE-19] was premised, in large part, on Defendant's assertion that "the CBA contains language which could be read to limit dissemination of any information relating to the terms of the CBA." Mem. in Support of Mot. to Seal [DE-17] at p. 3. The language reads: "No information will be released without the expressed written permission of Mr. Mark J. Wenick as CEO of the entire Entity and spokesperson for the individuals." Mem. in Support of Mot. to Dismiss [DE-20], Ex. A-1 ("CBA") at p.2.

This court has determined that SCDF, and not "'Southeast Costal[sic] Development Funds, Fund 11', a.k.a. Balmoral," is one of the proper parties to the CBA, to the extent the document is a valid contract. Moreover, Wenick, as spokesperson for the parties to the CBA, has given his express written permission for the dissemination of the information relating to the CBA by filing an Affidavit [DE-26]

which incorporates the very terms of the CBA. Consequently, Defendants no longer need be concerned about violating the CBA by disseminating its terms.

To the extent that Defendants contend the CBA contains confidential information regarding CREF's proprietary lists of service providers and debt and/or equity providers, the court concludes that concern may be alleviated through less drastic measures than sealing all the memoranda and exhibits relating to the Motion to Dismiss. Defendants indicate that the proprietary lists are referenced only on pages 2(a) and 4(a)-4(d) of the CBA. None of the information on these pages of the CBA is discussed or referenced in any of the parties' memoranda regarding the motion to dismiss. Consequently, the court will allow the CBA itself to remain sealed, but CREF will be required to file a redacted version of the CBA omitting the proprietary lists on the record.

Accordingly, to the extent that SCDF's Motion to Seal [DE-23] is asking the court to reconsider its March 11, 2008, Order, the motion is ALLOWED in part. The Clerk of Court is DIRECTED to maintain the following documents under seal: DE-20-4, DE-26-6, and DE-26-8. All other previously sealed documents hereby are unsealed. Defendant CREF is DIRECTED to file, on or before April 13, 2009, a redacted version of the CBA that does not contain the proprietary lists.

## V. CONCLUSION

Defendants' Motion to Dismiss [DE-18] is DENIED in part and ALLOWED in part. To the extent that Defendant Terry L. Smith moves to dismiss the claims against him for lack of personal jurisdiction, the motion is ALLOWED and SCDF's claims against Smith are DISMISSED. Defendant CREF's motion to dismiss SCDF's claim for treble damages also is ALLOWED. However, Defendant CREF's motion to dismiss for lack of standing, lack of personal jurisdiction, and failure to join necessary parties is DENIED.

Plaintiff SCDF's Motion to Seal [DE-23], to the extent it is seeking reconsideration of this court's March 11, 2008 Order, is ALLOWED in part, and the Clerk of Court is DIRECTED to maintain the following documents under seal: DE-20-4, DE-26-6, and DE-26-8. All other sealed documents may be unsealed upon the filing of this order. Defendants' Motion to Seal [DE-30] is DENIED.

SO ORDERED. This the 2<sup>d</sup> day of April, 2009.

James C. Fox
James C. Fox
Senior United States District Judge